IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| ISRAEL SALINAS, JR., | § | |
| Institutional ID No. 02181382, | § | |
| SID ID No. 09174265, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 1:20-CV-00181-BU |
| | § | |
| BRYAN COLLIER, *et al*., | § | |
| | § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS
OF THE UNITED STATES MAGISTRATE JUDGE**

Plaintiff ISRAEL SALINAS JR., proceeding pro se, is an inmate currently incarcerated by the Texas Department of Criminal Justice (TDCJ) at the Coffield Unit in Tennessee Colony, Texas. Dkt. No. 22-1 at 3. He brings this lawsuit under 42 U.S.C. § 1983 claiming that Robertson Unit officials were deliberately indifferent to his serious medical needs by depriving him of a "walker/rollator" in violation of the Americans with Disabilities Act (ADA) and the Eighth Amendment. Dkt. No. 22 at 4. He also brings various related claims arguing that officials were negligent in protecting him from, and enforcing policies against, acts of deliberate indifference. *Id.*

Salinas was granted leave to proceed *in forma pauperis* (IFP) under 28 U.S.C. § 1915. Dkt. No. 8. United Stated District Judge James Wesley Hendrix transferred this case to the undersigned for an initial case review under 28 U.S.C. §§ 1915 and 1915A. Dkt.

1

No. 9. And because Salinas has not consented to the undersigned exercising the full juris-diction of the Court, the undersigned submits these proposed findings of fact, conclusions of law, and recommendations for the disposition of this case. *Id.*

After careful consideration of the claims in Salinas's Second Amended Complaint, and the amendments to those claims through his responses to the Court's two question-naires, *see* Dkt. Nos. 22, 22-1, 25, 43, the undersigned recommends that Salinas's claims be dismissed.

## PROCEDURAL BACKGROUND

After filing his initial Complaint, Salinas was granted leave to proceed IFP, Dkt. No. 8, and the case was transferred to the undersigned the same day for initial case review. Dkt. No. 9. The Court ordered and received the TDCJ administrative records relevant to Salinas's claims, Dkt. Nos. 12, 14. Salinas was then allowed to file an amended complaint on January 5, 2021, Dkt. No. 15, and again on April 29, 2021. Dkt. No. 22.

The Court also ordered Salinas to respond to a questionnaire to help him develop the factual basis for his claims, Dkt. No. 23, but Salinas failed to respond. The Court then entered a Show Cause Order requiring Salinas to respond. Dkt. No. 24. Salinas then filed his responses. Dkt. No. 25. The Court later ordered Salinas to respond to a supplemental questionnaire, Dkt. No. 36, which he refused to do, and instead filed a motion to be excused from answering the questionnaire. *See* Dkt. Nos. 34, 36. The Court then stayed and admin-

istratively closed this case until it could secure Salinas's compliance with the Court's or-ders. *See* Dkt. Nos. 38, 39, 41. Salinas finally responded to the supplemental questionnaire, Dkt. No. 43, and the Court lifted the stay and reopened the case on January 18, 2023. Dkt. No. 46.

## FACTUAL BACKGROUND

Salinas is a veteran with a 50% service-connected disability. Dkt. No. 25-1 at 25–26. His disability relates to two previous surgeries to reconstruct his anterior cruciate liga-ment (ACL), including a bone graft taken from his right knee to repair his left knee. Dkt. No. 25 at 6. He states that, at some unspecified point, he was issued a walker/rollator "to use for prolonged and long distance walking and to use to sit due to instability in knees and to relieve stress and pain in L4-L5-S-1 from injuries." *Id*. His diagnoses while at the Rob-ertson Unit were morbid obesity (5'11" and 352 pounds), pressure ulcers, and hyperten-sion.

Although Salinas purports to bring several different claims, they all relate back to the confiscation by prison officials of his walker on August 23, 2018. *See generally* Dkt. Nos. 22, 25, 43. Salinas alleges that the removal of his walker constituted deliberate indif-ference to his serious medical needs and a violation of his rights under the ADA. *See* Dkt. 22. Specifically, he claims that Nurse Jackie Gregory "endangered his life and placed him in imminent danger and harm" by taking away his walker. Dkt. No. 22-1 at 4. Salinas also

makes several claims against Sergeant Bradley Johnson, claiming that in addition to taking away his walker at Gregory's suggestion, Johnson also:

> [D]id "impede", "interfere with" and delay Plaintiffs' prescribed medical treatment after said treatment was already in place, and did continue to "Harass", "taunt" as well as use profane language, discriminatory slurs and deny plaintiff scheduled meals, access to courts, religious services by his malicious misconduct and total disregard to plaintiff's serious medical needs.

Dkt. No. 22-1 at 3. The medical treatment referenced by Salinas appears to be the issuance of the walker because he states elsewhere that, "my only prescribed treatment is or was usage of medically prescribed treatment, walker/rollator." Dkt. No. 25 at 2.

Additionally, Salinas brings a deliberate indifference claim against Dr. Robert O. Martin arising out of the same facts, stating that Martin refused to examine and treat him after his walker was taken away by Gregory and Johnson. Dkt. No. 22-1 at 5. He also brings an ill-defined claim against Leeroy Cano, Assistant Warden of the Robertson Unit, as well as multiple claims against TDCJ and its Executive Director, Bryan Collier. Dkt. No. 22 at 3; Dkt. No. 22-1 at 1–2, 6.

## LEGAL STANDARDS

A court must dismiss a complaint filed by a prisoner against a government entity or employee if the court determines the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. § 1915A(b) (applying section to any suit by a prisoner against

certain governmental entities, regardless of whether the prisoner is proceeding *in forma pauperis*).

A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint lacks an arguable basis in fact if it rests upon clearly baseless factual contentions, and similarly lacks an arguable basis in law if it contains indisputably meritless legal theories. *See id.* at 327; *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005).

Dismissal for failure to state a claim—whether under Section 1915(e)(2)(B)(ii), Section 1915A(b)(1), or Rule 12(b)(6)—"turns on the sufficiency of the 'factual allegations' in the complaint." *Smith v. Bank of Am., N.A.*, 615 F. App'x 830, 833 (5th Cir. 2015) (per curiam) (quoting *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam)). Thus, if a plaintiff "plead[s] facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that they contend entitle them to relief, the claims should not be dismissed merely because the plaintiff fails to articulate the proper legal theory that otherwise makes those facts actionable in court. *Johnson*, 574 U.S. at 11–12 (citing Fed. R. Civ. P. 8(a)(2)–(3), (d)(1), (e)).

Courts accept *well-pleaded* factual allegations as true. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016). This means the factual allegations, while not required to be detailed, must amount to more than mere labels, conclusions, or a statement

of the legal elements of a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Chhim*, 836 F.3d at 469.

For claims to be substantively plausible, a plaintiff need not establish that the pleaded facts probably occurred as alleged, but the facts must allow the court "to infer more than the mere possibility of misconduct." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678–79). Even pro se plaintiffs must plead facts that raise the right to relief above a speculative level. *Chhim*, 836 F.3d at 469 (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)). And when plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

When evaluating a complaint under these standards, courts liberally construe the pleadings of pro se plaintiffs, holding their complaints to "less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). But "liberal construction does not require that the Court . . . create causes of action where there are none." *Smith v. CVS Caremark Corp.*, No. 3:12-cv-2465-B, 2013 WL 2291886, at *8 (N.D. Tex. May 23, 2013). "To demand otherwise would require the 'courts to explore exhaustively all potential claims of a *pro se* plaintiff'" and would "'transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party.'" *Jones v. Mangrum*, No.

3:16-cv-3137, 2017 WL 712755, at *1 (M.D. Tenn. Feb. 23, 2017) (quoting *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)).

Ultimately, "'[d]etermining whether a complaint states a plausible claim for relief' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 679).

<u>ANALYSIS</u>

Salinas sues the prison officials in their official and personal capacities. *See* Dkt. No 22-1. He also sues TDCJ. *Id*. The only relief he seeks is monetary,[1] specifically, $80,000 from each individual defendant and $500,000 from TDCJ. Dkt. No. 22-1 at 1–6.

A.     <u>Official capacity claims for monetary damages under § 1983</u>

Section 1983 claims against a state official in their official capacity are, in effect, claims against the state itself or the government agency that employs the official, making a claim against the official no different than a claim against the state. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). And the Eleventh Amendment bars suits against a nonconsenting state in federal court for monetary damages. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104 (1984). Thus, by extension, the Eleventh Amendment also bars suits for money damages against a state official in their official capacity because the

---

[1] Salinas admits that once he was transferred to the Coffield Unit, he received a cane shortly after arriving in October 2018, and then later a walker. Dkt. No. 43 at 2.

state is the "real, substantial party in interest." *Hughes v. Savell*, 902 F.2d 376, 377–78 (5th Cir. 1990) (quoting *Ford Motor Co. v. Dept. of Treasury of Ind.*, 323 U.S. 459, 464 (1945)). For this reason, Salinas's § 1983 claims against the state officials in their official capacities for monetary damages should be dismissed as frivolous and for seeking relief against a defendant who is immune from such relief under 28 U.S.C. §§ 1915(e)(2)(B)(i), (iii) and 1915A(b)(1)–(2).

B.    Personal capacity claims under § 1983

### 1. Jackie S. Gregory

In his Second Amended Complaint, Salinas states that, "Defendant Jackie S. Gregory, on the 23rd of August 2018 did knowingly and intentionally while working under color of state law acted with blatant and flagrant 'deliberate indifference' to plaintiff's 'factual and obvious' disability by maliciously confiscating plaintiff's walker/rollator 'after' medical appointment had ended per suggestion of defendant, Bradley Johnson." Dkt. No. 22-1 at 4. Salinas complains further that Gregory "abused her position and authority to modify already in place restriction(s) and treatment prescribed by Joseph M. Curry [at the Byrd Unit]." No. 22-1, at 4.

Salinas was asked through the questionnaire to expound on the factual basis for his deliberate indifference claim against Gregory. He states that he was given a medical pass for a walker during his March 12, 2018, intake at the Bryd Unit. Dkt. No. 25 at 2; *see also* Dkt. No. 22–1 at 3. Salinas was then transferred to the Robertson Unit a few days later on

March 19, 2018. Dkt. No. 25-1. After his transfer to the Robertson Unit, Gregory issued him a medical pass for a walker for the period of May 17, 2018, through May 17, 2019. Dkt. No. 25 at 2. But Salinas states that after his August 23, 2018 appointment with Gregory, "all my restrictions and medically necessary equipment was denied." *Id*.

Salinas claims that Gregory removed his walker on the recommendation of Johnson.[2] Dkt. Nos. 22-1 at 4; 22 at 3. When asked in his questionnaire why Gregory would follow Johnson's recommendation, Salinas states that he does not know. Dkt. No. 43 at 2. When asked how he moved throughout the Robertson Unit after the walker was removed, he stated that he "walked slowly as not to put too much pressure on my knees, and sought support from the walls and fencing." *Id*. But, he claims, officers would yell at him to keep his hands off the walls and fences. *Id*.

Salinas claims that Gregory was deliberately indifferent to his serious medical needs when she modified his medical pass for a walker.[3] Dkt. No. 22-1 at 4. Additionally, he claims that the medical passes was modified by Gregory in retaliation for his filing this lawsuit. Dkt. No. 22-1 at 4. Asserting the same facts, Salinas also claims the Defendants violated his rights under the ADA, discussed separately below.

---

[2] Salinas also claims that Johnson removed the walker at the suggestion of Gregory. *Id*. at 3.

[3] A medical pass is an accommodation issued by a healthcare provider when restrictions alone do not adequately meet an inmate's medical needs. *See* Correctional Managed Health Care (CMHC) Policy A-08.8, https://www.tdcj.texas.gov/divisions/cmhc/cmhc_policy_manual.html (last visited February 2, 2024).

*a. Deliberate indifference to serious medical needs*

Under the Eighth Amendment, prison officials have a duty to provide adequate medical care to prisoners. *Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013). A prisoner seeking to establish an Eighth Amendment violation regarding medical care must allege *facts* showing that prison officials were deliberately indifferent to his serious medical needs. *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)) (explaining that because "only the 'unnecessary *and wanton* infliction of pain' implicates the Eighth Amendment, a prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs") (emphasis in original). "Deliberate indifference" means that the denial of medical treatment was "much more likely than not to result in serious medical consequences, and additionally that the defendants had sufficient knowledge of the situation so that the denial of medical care constituted wanton disregard of the prisoner's rights." *Johnson v. Treen*, 759 F.2d 1231, 1238 (5th Cir. 1985).

To successfully claim deliberate indifference to serious medical needs, a prisoner must satisfy both an objective and subjective test. *Rogers*, 709 F.3d at 410. First, the prisoner must plausibly establish an objective exposure to a substantial risk of serious bodily harm. *Gobert v. Caldwell*, 463 F.3d 339, 345–46 (5th Cir. 2006). As to the subjective component, the prisoner must establish that the prison official (1) knew the prisoner faced a substantial risk of serious harm and (2) disregarded that risk by failing to take reasonable

measures to abate it. *Id.* at 346; *see also Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999).

The deliberate indifference standard is difficult to meet. *See Domino v. Texas Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001). And allegations of malpractice, negligence, or unsuccessful treatment fail to meet the standard. *Gobert*, 463 F.3d at 346. Similarly, a prisoner's disagreement with the medical treatment provided does not give rise to a constitutional claim. *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). The prison official must have engaged in conduct that shows "a wanton disregard for any serious medical needs." *Treen*, 759 F.2d at 1238.

The only "treatment" at issue in Salinas's deliberate indifference claim is the medical pass for a walker.[4] Dkt. No. 25 at 2. Otherwise, Salinas does not claim that he was denied needed medical attention or treatment. He claims simply that he was denied the specific mobility aid he wanted.

Salinas fails to explain how Gregory's modification of his medical pass constituted an abuse of her position or authority. It appears undisputed that she had such authority because the pass Salinas complains was modified by Gregory was also issued by her—not Curry—upon Salinas's intake at the Robertson Unit. Dkt. Nos. 25 at 2; 25–1 at 3. Indeed, the same CMHC policy Salinas admits applies to this situation provides:

---

[4] All subsequent references to a medical pass are to one for a walker.

> Recognizing that an inmate's condition may change and/or opinions may dif-
> fer among healthcare professionals, an inmate's pass(es) may be reordered
> or discontinued at the discretion of a physician, dentist, psychiatrist, mid-
> level practitioner, or clinical pharmacist.[5]

While Salinas disagrees with Gregory's exercise of her discretion in this regard, it appears

clear that she had the authority—if not obligation—to reassess his need for the pass.

There are two sets of documents before the Court pertaining to Salinas's claims.

The first is a select subset of the TDCJ authenticated records filed by Salinas with his

questionnaire responses. *See* Dkt. Nos. 25-1; 43-1. The Court is required to consider these

records in screening Salinas's claims. *See Howard v. King*, 707 F.2d 215, 220 (5th Cir.

1983) (a court is "required to look beyond the inmates' formal complaint and to consider

as amendments to the complaint those materials subsequently filed.").

The second set of documents before the Court is the complete authenticated records

provided by TDCJ. The Court may not use records provided by TDCJ "to resolve material

disputed fact findings when they are in conflict with the [pro se prisoner's] pleadings or

affidavits." *Newby v. Quarterman*, 325 F. App'x 345, 354 (5th Cir. 2009); *see also Car-

dona v. Taylor*, 828 F. App'x 198, 201 (5th Cir. 2020). But conclusory factual allegations

are not material. And "dismissals can be based on 'medical and other prisoner records' if

they are 'adequately identified or authenticated,'" as they are here. *Banuelos v. McFarland*,

---

[5] CORRECTIONAL MANAGED HEALTH CARE (CMHC) POLICY A-08.8, https://www.tdcj.texas.gov/divi-
sions/cmhc/cmhc_policy_manual.html (last visited February 2, 2024).

41 F.3d 232, 234 (5th Cir. 1995) (quoting *Wilson v. Barrientos*, 926 F.2d 480, 482–84 (5th Cir. 1991)).

The records filed by Salinas confirm that he had his TDCJ intake at the Byrd Unit on March 12, 2018, and was examined by Joseph M. Curry. Dkt. No. 25-1 at 3–4. Curry appears to be Gregory's counterpart at the Byrd Unit. Curry assigned several medical restrictions to Salinas, including lower bunk and ground floor assignments, no climbing, and no lifting over 25 pounds. *Id.* at 4. Curry also issued several medical passes for Salinas, including passes for Disability Shower, Disability Chow, a CPAP device, and a walker/rollator, each pass beginning March 12, 2018, and ending September 8, 2018. *Id.* at 3.

Salinas was then transferred to the Robertson Unit a few days later, March 19, 2018. Dkt. No. 25-1. He does not state how long he was at the Robertson Unit, but the records indicate that he left the Robertson Unit on October 24, 2018, and arrived at the Coffield Unit (his current unit) on October 25, 2018. Thus, he was at the Robertson Unit for approximately 7 months, which is consistent with his allegations.

The records Salinas filed with his questionnaire responses further reflect that, upon his arrival at the Robertson Unit in March 2018, he was allowed to continue under the previously issued medical pass that was to expire on September 8, 2018. Dkt. No. 25-1 at 3. Consistent with Salinas's allegations, this pass appears to have been extended by Gregory on May 17, 2018, for the period ending May 17, 2019. Dkt. No. 43-1 at 1. Thus, Salinas appears to have been allowed to use a walker from his arrival at the Robertson Unit

13

in March 2018 until the pass was discontinued by Gregory in August 2018. *See* Dkt. No. 25-1 at 23. Once Salinas was transferred to the Coffield Unit, he received a cane shortly after his arrival and then later a walker. Dkt. No. 43 at 2. This means that Salinas was deprived of a walker while at the Robertson Unit from August 23, 2018, until his departure on October 24, 2018, a period of two months.

The undersigned's review of the complete authenticated records provided by TDCJ appears to confirm certain aspects of Salinas's allegations, while also providing greater factual context for his claims. For instance, the authenticated records confirm that Salinas's walker was confiscated by Gregory on August 23, 2018. On that date, Gregory's clinical notes reflect that Salinas was "argumentative and hostile" and was "[n]oted to walk without use of walker as enters exam room—taps it on the ground now and then when ambulating." Gregory recorded that Salinas, "[w]hen leaves office, carried walker in rapid, steady pace" and "[s]tood without assist or lean for minimum of 30 minutes after leaving encounter." Gregory further records that, "[w]alker confiscated—he is ambulating rapidly, carrying it" and that he was ambulating the "full length of 12 bldg with no assist or complication."

Salinas does not directly dispute these facts as recorded by Gregory as having occurred on August 23, 2018, or otherwise dispute the accuracy of the authenticated records. But his ability to ambulate without a walker is the central issue in this case. Thus, to the extent Gregory's notes contradict Salinas's allegations on this point—and they do—it would be improper at the screening stage to resolve that factual dispute through reliance

14

on the authenticated records not filed by Salinas. *See Davis v. Lumpkin*, 35 F.4th 958, 964 (5th Cir. 2022). And accepting Salinas's allegations as true and construing them in a light favorable to him compels the conclusion that it is plausible he was unable to walk, at least long distances, without the assistance of a walker or cane. Less clear is whether this limitation objectively constituted a substantial risk of serious bodily harm.

The deliberate indifference standard is difficult to meet. *See Domino*, 239 F.3d at 756. "Deliberate indifference" means that the denial of medical treatment—here, the walker—was "much more likely than not to result in serious medical consequences . . . ." *Treen*, 759 F.2d at 1238. On that point, the undersigned considers the records Salinas filed, which includes several I-60's he submitted to Gregory and other Robertson Unit staff.[6] Dkt. No. 25-1 at 9–24. Those records reflect the following:

> On August 27, 2018: Salinas submitted an I-60 to the medical staff asking them to, "[p]lease reconsider giving me my walker back, pain medication for my back and knees, I am in am have been in constant pain since you stopped my pain medication and without my walker for support, I have increased swelling in my L knee and added stress to my R knee, leg, ankle, as well as my back." Dkt. No. 25-1 at 13. Gregory responded to his I-60 with, "Meds ordered. Walker not necessary @ this time." *Id.*

> On August 30, 2018: Salinas submitted an I-60 to Dr. Martin stating that Gregory, "ceased my meds, took my walker, and restrictions, and I have put in 3 requests to see her again, as added stress to my knees, and back without the support of the walker, and medication, it is getting more and more difficult for daily activities." Dkt. No. 25-1 at 11. Gregory replied on September 4, "You were in no distress when seen. You were ambulating rapidly without walker. You have pain meds ordered." *Id.*

---

[6] I-60s are Inmate Request to Official forms used by TDCJ inmates to communicate with TDCJ staff.

> On September 10, 2018: Salinas submitted an I-60 to medical stating, "I am again requesting my walker be returned. I am in tremendous pain in my lower back, and I am having a very difficult time with daily activities as allowed. No meds have arrived as told to me by [Gregory] on my last injury when I fell the morning of the 5th of Sept. 18. I am having difficulty sleeping, walking, and even sitting as the added stress have caused my lower back and legs to worsen since the 23 of Aug. 18." Dkt. No. 25-1 at 9. Gregory responded on September 12, "You are not requiring walker for ADLs [activities of daily living]." *Id*.

Accepting Salinas's allegations as true and construing them in a light most favorable to him, the undersigned concludes that it is plausible the additional pain and swelling experienced by Salinas without a walker constituted a substantial risk of serious bodily injury.

But Salinas is also required to plausibly demonstrate that Gregory "had sufficient knowledge of the situation so that the denial of medical care constituted wanton disregard of [his] rights." *Treen*, 759 F.2d at 1238. And on the issue of Gregory's subjective indifference, Salinas's allegations and the records he filed with his questionnaire responses, consistently depict that Gregory independently determined—and right or wrong, believed herself—that Salinas did not need a walker. And while Salinas alleges that she "maliciously" confiscated his walker, Dkt. No. 22-1 at 4, that is nothing more than a label reflecting his subjective opinion, not a fact. The only facts Salinas pleads in this connection are that on August 23, 2018, Gregory confiscated his walker following his medical appointment with her. But there are no facts to support an inference that Gregory *actually perceived* an objective risk of serious harm to him and disregarded that risk. At most, there was a disagreement about whether Salinas needed the walker.

16

Salinas's pleaded facts are that Gregory allowed him to have a walker for five of the seven months he was at the Robertson Unit, and that she only removed it after reassessing his need for the walker five months later on August 23, 2018. Whatever reasons Gregory had for removing the walker, there are insufficient facts to plausibly support that her doing so amounted to refusing to treat him, ignoring his complaints, intentionally treating him incorrectly, or engaging in any similar conduct that would clearly evince a wanton disregard for his serious medical needs. *See Kelson v. Clark*, 1 F.4th 411, 417 (5th Cir. 2021). To the contrary, Salinas's filed records reflect that she responded to his requests and complaints, just not with the responses Salinas wanted. Furthermore, "the decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" *Domino*, 239 F.3d at 756 (quoting *Estelle*, 429 U.S. at 107).

Salinas characterizes Gregory's actions as "malicious." Dkt. No. 22–1 at 4. But other than this single, conclusory label describing Salinas's subjective opinion of Gregory's actions, his factual allegations, the records he filed, and the authenticated records are all consistent on one critical point: Gregory did not subjectively believe Salinas needed a walker. "And, the 'failure to alleviate a significant risk that [the official] should have perceived, but did not' is insufficient to show deliberate indifference." *Domino*, 239 F.3d at 756 (quoting *Farmer*, 511 U.S. at 838).

At most, Gregory may have been negligent in failing to appreciate the severity of Salinas's impairments. But "[d]eliberate indifference is a degree of culpability beyond

mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentionally negligent oversight." *Alvarez v. City of Brownsville*, 904 F.3d 382, 391 (5th Cir. 2018) (en banc) (quoting *James v. Harris Cnty.*, 577 F.3d 612, 617–18 (5th Cir. 2009)); *see also Kelson*, 1 F.4th at 417 ("[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm") (cleaned up).

Undoubtedly, inadequate medical care "may, at a certain point, rise to the level of a constitutional violation," but "malpractice or negligent care does not." *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999). And an inmate's mere disagreement with the type of medical care he receives is insufficient to make out an Eighth Amendment violation. *See Domino*, 239 F.3d at 756; *Norton*, 122 F.3d at 292; *see also*, *e.g.*, *Holland v. Patel*, 236 F. App'x 136, 137 (5th Cir. 2007) (per curiam) ("[Prisoner's] assertion that he required a cane and that [defendant doctor] wrongfully took his away amounts to no more than a mere disagreement with the medical treatment he received or, at most, a claim for negligence and was thus properly dismissed.") And the mere fact that Gregory's assessment of Salinas's need for a walker differed from that of her counterpart at the Byrd Unit does not change this conclusion.

The undesigned is unable to conclude that Gregory acted with wanton disregard for Salinas's rights in removing the walker. And while Salinas clearly disagreed with that de-

cision, such disagreement is insufficient to plausibly support that Gregory was acting maliciously or with knowledge that Salinas faced a substantial risk of serious bodily harm without a walker.

Salinas's disagreement with the medical decisions made by Gregory, even if those decisions differed from the ones made by her counterpart at the Byrd Unit, falls short of plausibly establishing deliberate indifference to his serious medical needs in violation of the Eight Amendment.[7] Salinas does not, and presumably cannot, claim that he was denied needed medical care; just that he was denied the specific type of care he wanted. *See Norton*, 122 F.3d at 292.

For these reasons, the undersigned RECOMMENDS that Salinas's deliberate indifference claim against Jackie Gregory be dismissed for failure to state a claim upon which relief may be granted.

### b. *Retaliation claim*

Salinas also claims that Gregory retaliated against him for filing suit by modifying the restrictions and treatment prescribed during his intake at the Byrd Unit. Dkt. No. 22-1 at 4.

---

[7] In a similar vein, Salinas does not have a viable claim for being prescribed "cembolta" without "being seen" because this allegation is a mere disagreement with the treatment that Salinas received. *See* Dkt. No. 25 at 4.

"To prevail on a claim of retaliation, a prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." *Morris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006) (quoting *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998)). Retaliation is actionable only "if it is capable of deterring a person of ordinary firmness from further exercising his constitutional rights." *Id.* at 686.

The Fifth Circuit has recognized that "[t]he prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995). "Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions." *Id*. Thus, prisoners' claims of retaliation should be "carefully scrutinized by the courts." *Adeleke v. Fleckenstein*, 385 F. App'x 386, 387 (5th Cir. 2010) (citing *Woods*, 60 F.3d at 1166).

Conclusory allegations, including a prisoner's personal belief that he is the victim of retaliation, are insufficient to support a claim for retaliation. *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999) (citing *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997)). Instead, "[t]he inmate must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred." *Haddix v. Kress*, 203 F. App'x 551, 554 (5th Cir. 2006) (quoting *Woods*, 60 F.3d at 1166).

"Filing grievances and otherwise complaining about the conduct of correctional officers through proper channels are constitutionally protected activities, and prison officials may not retaliate against inmates for engaging in such protected activities." *Reese v. Skinner*, 322 F. App'x 381, 383 (5th Cir. 2009) (citing *Morris*, 449 F.3d at 684). However, prisoners do not have a right to directly and verbally confront Unit staff with their grievances. *Freeman v. Texas Dep't of Crim. Just.*, 369 F.3d 854, 864 (5th Cir. 2004) ("Prison officials may legitimately punish inmates who verbally confront institutional authority without running afoul of the First Amendment.").

As an initial matter, the Court notes that while Salinas claims Gregory retaliated against him for filing suit by modifying his restrictions and treatment, the removal of his walker occurred two years before he filed this suit. Moreover, the absence of a plausible constitutional violation is fatal to Salinas's retaliation claim against Gregory. *Morris*, 449 F.3d at 684. Even disregarding those obstacles, Salinas has produced neither direct evidence of retaliatory motive on the part of Gregory, nor a chronological series of events from which retaliation may be plausibly inferred. *See Haddix*, 203 F. App'x at 554.

For these reasons, the undersigned RECOMMENDS that Salinas's retaliation claim against Gregory be dismissed under 28 U.S.C. §§ 1915(e)(2) and 1915A(b)(1) as frivolous and for failure to state a claim upon which relief may be granted.

### *2. Bradley D. Johnson*

Salinas claims that Johnson: (1) was deliberately indifferent to his serious medical needs, Dkt. No. 22 at 3; (2) harassed and taunted him, and used profanity and discriminatory slurs, Dkt. No. 22-1 at 3; and (3) denied him "scheduled meals, access to courts, religious services, Dkt. No. 22-1 at 3. This latter claim appears to be that Salinas was denied access to meals, the courts, and religious services because he was denied a walker to get to these places.

#### *a. Deliberate indifference to serious medical needs*

Arising from the same denial of a walker at issue with Gregory, Salinas claims that Johnson was also deliberately indifferent to his serious medical needs. In his Second Amended Complaint, Salinas claims that Johnson was the one who seized his walker on August 23, 2018. Dkt. No. 22-1 at 3. He claims that Johnson "did 'impede,' 'interfere with' and delay Plaintiff's prescribed medical treatment after said treatment was already in place[.]" *Id.* But Salinas does not explain how or why he believes Johnson was responsible for the confiscation of the walker. And like the claims against Gregory, the allegations against Johnson are nothing more than labels and conclusions reflecting Salinas's subjective beliefs.

The undersigned asked Salinas to expound on why he believes Johnson would have taken his walker, and he responded, "I don't know." Dkt. No. 43 at 1. He added, "While waiting outside the NP [nurse practitioner] office in the hallway, after my appointment was

22

completed, Johnson took my walker. I cannot answer for his actions nor will I attempt to answer for another individual's actions." *Id*.

Here again, even assuming Salinas was objectively exposed to a substantial risk of serious bodily harm through being denied a walker, he has not alleged facts from which the undersigned can infer that Johnson was involved in rescinding the walker out of malice or through some wanton disregard for Salinas's well-being.[8] As with Gregory, Salinas does not appear to factually dispute that Johnson actually believed Salinas did not need a walker.

For these reasons, Salinas has failed to plausibly support a deliberate indifference claim against Johnson and that claim should be dismissed for failure to state a claim upon which relief may be granted.

### b. Harassment, taunting, profanity, and slurs

Salinas further claims that Johnson continued "to 'harass,' 'taunt' him as well as use profane language, discriminatory slurs" at him. Dkt. No. 22-1 at 3. Salinas cites to his status as an honorably discharged veteran of military service and that Johnson instructed other officers to not call Salinas "sir" and told Salinas that he was a "nothing" and a "nobody." Dkt. No. 25 at 2. Salinas claims Johnson would try to provoke him by "aggressively lurching at me hollering, 'What!' and saying[,] 'Good luck with that grievance,' my 'girls' are

---

[8] Additionally, Salinas does not allege that Johnson's involvement extended beyond the August 23, 2018, initial confiscation of his walker. But Salinas did not file this lawsuit until August 31, 2020, more than two years after the incident. Thus, his claim against Johnson would also appear to be barred by the two-year statute of limitations applicable to § 1983 claims. *Owens v. Okure*, 488 U.S. 235, 239 (1989); *Balle v. Nueces Cnty., Texas,* 952 F.3d 552, 556 (5th Cir. 2017) (citing Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a)); *see also Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001).

going to trash it." *Id.* This claim appears to be related to Salinas's status as a veteran and not related to the walker.

Threats, verbal taunts, insults, and even racial slurs, which may be viewed as offensive, do not give rise to liability under § 1983. *See Bender v. Brumley*, 1 F.3d 271, 274 n.4 (5th Cir. 1993). The Fifth Circuit Court of Appeals has long recognized that verbal threats made by a correctional officer do not constitute a basis for a § 1983 claim, even if the verbal threats happened. *Robertson v. Plano City*, 70 F.3d 21, 24 (5th Cir. 1995) (citing *McFadden v. Lucas*, 713 F.2d 143 (5th Cir. 1983)). And abusive language or other verbal harassment, "while unprofessional and inexcusable, are simply not sufficient to state a constitutional claim under 42 U.S.C. § 1983." *Johns v. Miller*, 2005 WL 3592248, at *7 (E.D. La. Oct. 26, 2005) (citations omitted).

Here, Salinas does not allege that he suffered any physical harm from the comments, and their connection, if any, to the alleged deliberate indifference claim is too tenuous to plausibly support any claim of retaliation or harassment.

For these reasons, the undersigned RECOMMENDS that Salinas's claim against Johnson for harassment, taunting, profanity, and slurs be dismissed as frivolous and for failure to state a claim upon which relief may be granted.

*c. Denial of access to meals and the law library*

Salinas's claims of being denied access to meals and the law library both grow out of the same set of facts as his deliberate indifference claims, that is, the absence of a walker prevented him from ambulating to those services.

The Fifth Circuit has held that "[b]ecause depriving a prisoner of adequate food is a form of corporal punishment, the [E]ighth [A]mendment imposes limits on prison officials' power to so deprive a prisoner." *Cooper v. Sheriff, Lubbock Cnty.,* 929 F.2d 1078, 1083 (5th Cir. 1991) (holding that a deprivation of food for five consecutive days states a claim that may entitle a prisoner to relief).

And prisoners also have a constitutionally recognized right to access the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977). But the scope of a prisoner's right of access to courts is not unlimited, and "encompasses only 'a reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement.'" *Johnson*, 110 F.3d at 310–11 (citing *Lewis v. Casey*, 518 U.S. 343, 356 (1996)). Since a prisoner's right of access to courts is not an "abstract, freestanding right to a law library or legal assistance," claims alleging a constitutional violation must be accompanied by show-ings of actual injury. *Lewis*, 518 U.S. at 351. Actual injury" is "actual prejudice with re-spect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim." *Id*. at 348. And consistent with the limited scope of the right, the "injury requirement is not satisfied by just any type of frustrated legal claim." *Id*. at 354.

A prisoner must allege injury arising out of a direct appeal of his criminal conviction, a habeas petition, or a civil rights action under § 1983. *Id.* at 354–55.

Salinas's claims of being denied access to meals and the law library are vague and lack sufficient factual support to permit a reasonable inference that not having a walker prevented him from accessing meals or the law library. He does not allege the number of meals or lay-ins he may have missed. Moreover, he does not claim to have suffered any harm because of the alleged denial of meals or law library access.

For these reasons, the undersigned RECOMMENDS that the Court dismiss Salinas's claims for denial of access to meals and the law library as frivolous and for failure to state a claim upon which relief may be granted.

### d. *Denial of access to religious services*

Salinas's religious exercise claim merits a more fulsome analysis. In connection with this claim, Salinas seeks compensatory and punitive damages, and declaratory judgment. *See* Dkt. Nos. 22-1, 25, 43. Both the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA) protect prisoners from government action that substantially burdens the free exercise of their religion, but to varying degrees. *See Holt v. Hobbs*, 574 U.S. 352, 356–57 (2015).

Salinas alleges that the Johnson burdened his religious exercise by not allowing him to attend Jewish services and class. Dkt. No. 25 at 2. He claims that on August 31, 2018, he was told that he had a lay-in to attend Jewish services and class but was required to go

to chow first. *Id.* When Salinas arrived at the chow hall, Johnson told him he was not going to eat and to go to religious services instead. *Id.* Salinas claims that he did as he was told, but the long walk to services without a walker was very painful for him. *Id.* After this August 31 incident, Salinas claims he was not allowed to go or be escorted to services while others were. Dkt. No. 25 at 2.

Through the questionnaire, the Court asked Salinas to specify which dates he was denied access to religious services. In response, he provided three instances. First, he claims that on September 4, 2018, a correctional officer instructed him to get ready for bible study, but a different and unknown correctional officer told him to return to his cell or receive a disciplinary case for being out of place. Dkt. No. 43 at 3. Second, Salinas states that on September 11, 2018, he did not get a religious service lay-in, but other inmates did. *Id*. And third, Salinas states that on September 18, 2018, a correctional officer named Pyle was on duty and denied him bible study access. *Id*.

### i. *First Amendment claim*.

The First Amendment requires that prisoners have reasonable opportunities "to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty." *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972). Thus, any prison regulations that burden religion must be "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). However, a prisoner may state a viable First

Amendment violation when they allege a prison official did not act under a policy or regulation, since such actions are not reasonably related to legitimate penological purposes. *See Witherspoon v. Waybourn*, 2021 WL 2635917, No. 4:20-cv-1150-P, at * 6 (N.D. Tex. June 25, 2021) (analyzing a chaplain's alleged denial of religious diet); *see also Shakur v. Selsky*, 391 F.3d 106, 110, 120 (2d Cir. 2004) (holding that a guard's intentional act that deprived a prisoner from attending a religious feast stated a viable First Amendment claim).

Again, Salinas appears to attribute his inability to attend religious services to the fact that he did not have a walker. But he also claims that on August 31 he was able to walk to religious services without a walker despite the difficulty. In the three instances identified by Salinas where he was unable to attend religious services, it is not clear whether he was denied the lay-ins because of some aspect of his religious beliefs, or for some other reason. Salinas's factual allegations are sparse on this point.

But there are few, if any, facts suggesting or supporting an inference that Salinas was being punished or penalized because he was Jewish, or that any prison official was pressuring him to not exercise his religious freedom. And even in the specific instances Salinas provides, he does not claim that Johnson was involved except on August 31 when he was directed by Johnson to attend services, which he did.

At its core, this claim, too, appears to be nothing more than Salinas being unhappy with the decision to deny him a walker. But there are insufficient facts to support a reasonable inference that either Salinas's religious freedom was being burdened or that denying him a walker was not reasonably related to a legitimate penological purpose.

For these reasons, the undersigned RECOMMENDS that the Court dismiss Salinas's First Amendment claim for failure to state a claim upon which relief may be granted.

*ii. RLUIPA claim.*

Congress enacted RLUIPA to provide greater protections than the protections provided under the First Amendment. *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005). RLUIPA mandates that:

> "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."

42 U.S.C. § 2000cc–1(a).

To benefit from the protections of RLUIPA, a plaintiff must first show that: (1) their religious exercise is grounded in a sincerely held religious belief and (2) that the government's action substantially burdens that exercise. *Ali v. Stephens*, 822 F.3d 776, 782–83 (5th Cir. 2016) (citing *Holt*, 574 U.S. at 360–61). RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a

system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). The government imposes a substantial burden when "it truly pressures the adherent to significantly modify his religious behavior and significantly violates his religious beliefs." *Adkins v. Kasper*, 393 F.3d 559, 570 (5th. Cir. 2004).

While Salinas has established through his pleadings that his religious beliefs are sincerely held, he has not pleaded sufficient facts to demonstrate that Johnson, Gregory, or any other TDCJ official, in denying him a walker, "truly pressure[d] [him] to significantly modify his religious behavior and significantly violate[] his religious beliefs." *Id.* Whatever impact the denial of a walker had on Salinas's religious practices, it would appear to have been purely incidental, at most. His pleadings are devoid of facts plausibly supporting that the denial of a walker constituted pressure for him to significantly modify his sincerely held beliefs.

For these reasons, the undersigned RECOMMENDS that the Court dismiss Salinas's RLUIPA claim for failure to state a claim upon which relief may be granted.

### 3. Robert G. Martin (M.D.)

Salinas claims that Dr. Martin was also deliberately indifferent to his serious medical needs. Dkt. No. 22 at 3. In his Second Amended Complaint, Salinas states that on October 12, 2018, Martin ignored instructions of Asst. Warden Leeroy Cano, the office of ombudsman, and Collier "to resolve plaintiffs and plaintiff's families concern of malicious conduct of medical staff members in his charge[,]" presumably referring to Gregory. Dkt.

No. 22-1 at 5. Salinas further charges that Martin acted "unprofessionally when he decided to 'side' and protect Jackie S. Gregory, his subordinate, by refusing to 'examine' and 'treat' plaintiff per instructions given to him by Assistant Warden Leeroy Cano." *Id*.; Dkt. No. 25 at 4. And that Martin "did not honor plaintiffs I-60 request to be seen, and responded only with, 'Plaintiff was seen ambulating rapidly without walker,' after discussing incident with (NP) Gregory and did not schedule 'examination' as instructed, with plaintiff." Dkt. No. 22–1 at 5.

When asked through the questionnaire to expound on the factual basis for his claims against Martin, Salinas stated that Martin showed deliberate indifference because he was aware of Salinas's "distress" without a walker yet refused Cano's instructions to reevaluate Salinas despite his "obvious disability." Dkt. No. 25 at 4.

Neither the records filed by Salinas nor the complete authenticated records support a conclusion that Cano instructed Martin to "resolve" Salinas's concerns to the latter's satisfaction. But the authenticated records provide greater context for Salinas's allegations, including a message sent from Salinas to a Dr. Talley stating:

> October 12, 2018, I spoke directly to Leeroy Cano, Assistant Warden, in response to a citizen's complaint my family filed with the TDCJ's Ombudsmen's Office, in Huntsville. Warden Cano was investigating the complaint. I 'am not' receiving adequate medical treatment 'after' submitting 'Nurse's Sick Call Requests' on a TDCJ I-60, and my notices and complaints 'are being ignored.' I am requesting to see a licensed medical doctor here on the unit, and 'not' a nurse practitioner or a physician's assistant . . . .

Martin responded, telling Salinas:

31

You had Cymbalta order for pain from 8/30 to 9/29 at the starting dose, and then a larger dose starting on 9/30. But the chart shows that you have not taken it at all. It takes some time to start having its effect—time that you wasted by not taking it. Start taking it and I will see you in a month to see how it's doing.

The authenticated records further reflect that Martin did not require Salinas to wait a month; rather, Martin examined him on October 17, 2018, and ordered an x-ray of Salinas's knee that same day. One of Martin's notes from that exam states that, "[f]rom the documented observations (several) it does not seem that he needs a walker."

As explained above, the Court may not use records provided by TDCJ "to resolve material disputed fact findings when they are in conflict with the [pro se prisoner's] pleadings or affidavits." *Newby,* 325 F. App'x at 354; *see also Cardona*, 828 F. App'x at 201. But conclusory factual allegations are not material. And a court may base a dismissal under 28 U.S.C. § 1915(e) "on medical or other prison records if they are adequately identified and authenticated," such as those included in a *Martinez* report, and medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs. *Banuelos,* 41 F.3d at 234–35.

Salinas's general allegations that Martin ignored him and refused to examine and treat him—*i.e.*, that Martin was deliberately indifferent to his medical needs—are clearly rebutted by the authenticated medical records showing he was not ignored or refused examination or treatment. This includes authenticated records covering the specific period during which Salinas claims generally that Martin was deliberately indifferent.

32

The undersigned accepts as true that Cano instructed Martin to investigate the concerns of Salinas and his family. The undersigned further accepts as true that Martin agreed with Gregory's assessment that Salinas did not require a walker. But the undersigned is not required to accept Salinas's characterization of Martin's agreement with Gregory's assessment as "unprofessional," nor Salinas's characterization of the medical staff as "malicious." These are not well-pleaded facts, but rather conclusory opinions couched as fact, which have no factual support.

As explained above, the deliberate indifference standard is difficult to meet. *See Domino*, 239 F.3d at 756. And allegations that support, at most, malpractice, negligence, unsuccessful treatment, *or disagreement with treatment* fail to meet that standard. *Gobert*, 463 F.3d at 346; *Norton*, 122 F.3d at 292. Here, Salinas has failed to plead sufficient facts to plausibly demonstrate that Martin both knew Salinas faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. *See Gobert*, 463 F.3d at 346.

Accordingly, the undersigned RECOMMENDS that the Court dismiss Salinas's deliberate indifference claim against Martin for failure to state a claim.

### 4. *Leeroy Cano*

Salinas makes no express claim against Cano. As alleged in his Second Amended Complaint, he states that on October 12, 2018, Cano sent for him to have a conference

about his family's complaint to the ombudsman's office. He claims that Cano called Martin in his presence and told him:

> "This guy is in obvious pain, and he is not yelling or demanding, and he is barely getting around. . . . I want you to see him and get this issue taken care of!" Plaintiff was told/instructed by defendant, that if nothing happened within one week, to submit an I-60 to see defendant directly.

Dkt. No. 22-1 at 6. Salinas claims Cano was deliberately indifferent by "intentionally becoming unavailable for two weeks after instructing plaintiff to contact him in a week's time[.]" *Id.*

When asked to expound through the questionnaire on his claims against Cano, Salinas stated simply that Cano "did not answer or set appointment as instructed." Dkt. No. 25 at 6. Salinas merely claims, without factual support, that Cano was aware of his pain and was therefore deliberately indifferent to his serious medical needs by "intentionally becoming unavailable for two weeks." Dkt. No. 22-1 at 6. Salinas does not provide facts supporting his conclusion that Cano's unavailability was intentional, or even related to Salinas at all. These allegations fall far short of stating a plausible claim that Cano was deliberately indifferent. Moreover, these threadbare allegations establish, if anything, that Cano's only personal involvement was attempting to help Salinas. At most, Cano's subsequent unavailability or failure to follow through might have been negligent.

For these reasons, Salinas's claim against Cano should be dismissed as frivolous and for failure to state a claim upon which relief may be granted.

### 5.  *Bryan Collier*

Salinas claims that Collier (1) failed to enforce policies, Dkt. No. 22 at 3; (2) was deliberately indifferent to Salinas's serious medical needs, *id.*; and (3) delayed responding to grievances and failed to resolve them, Dkt. No. 22-1 at 2.

Collier is the Executive Director of the TDCJ. Because personal involvement is an essential element of a § 1983 claim, liability of a supervisor cannot be based solely on the conduct of their subordinates. *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983). Supervisory officials may be held liable under Section 1983 for constitutional violations committed by subordinates only if: (1) the supervisor affirmatively participated in the acts that caused the constitutional deprivation; or (2) implemented unconstitutional policies that causally result in a constitutional injury. *Porter v. Epps*, 659 F.3d 440, 445–46 (5th Cir. 2011). "[A] supervisor may be held liable if he is not personally involved only if the supervisory official implements a policy 'so deficient that the policy is itself is a repudiation of constitutional rights and is the moving force of the constitutional violation.'" *Carter v. Livingston*, No. 9:17-cv-40, 2021 WL 836865, at *8 (E.D. Tex. Jan. 20, 2021) (quoting *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987)).

In his Second Amended Complaint, Salinas appears to be saying that Collier failed to intervene and override the decisions of staff at Robertson Unit regarding the denial of his walker/rollator. Dkt. No. 22-1 at 2. When asked to expound on the factual basis for this claim and how Collier was personally involved, Salinas claims Collier violated his rights

through his "failure to follow up with an investigation about my grievances, my medical, physical and mental needs and concerns" and failed to protect him from the "misconduct and hostile treatment I suffered at the hands of his staff." Dkt. No. 25 at 5. Otherwise, Salinas provides no facts to support his claims against Collier or provide sufficient information to establish how Collier was directly involved in violating his rights. Additionally, Salinas does not identify which policy or policies Collier failed to enforce.

For these reasons, the undersigned RECOMMENDS that Salinas's unsupported conclusion that Collier personally violated his rights should be dismissed as frivolous and for failure to state a claim upon which relief may be granted. To the extent Salinas intended to sue Collier in his official capacity as Executive Director of the TDCJ, for reasons explained above, *see supra* at 7, that claim is subsumed within Salinas's claims against the TDCJ, addressed below.

C.    <u>ADA Claims</u>

Asserting the same operative facts, Salinas claims that Johnson, Martin, Gregory, Cano, Collier, and the TDCJ all violated his rights under the ADA when they removed his walker. *See* Dkt. No. 22-1.

As a preliminary matter, Salinas does not specify in which capacity he brings claims against the individual Defendants. But the undersigned construes them as official capacity claims because Salinas cannot recover against the individual Defendants in their personal capacities under the ADA. *See, e.g.*, *Cole v. Velasquez*, 67 F. App'x 252 n.11 (5th Cir.

2003) (finding that the ADA's comprehensive remedial scheme bars suits against state officials in their individual capacities). Accordingly, the undersigned will address only Salinas's claims against Defendants in their official capacities.

As explained above, a suit against a state official in their official capacity "is a suit against the official's office." *Will*, 491 U.S. at 71. The ADA permits suits against state officials as representatives of the official's office. *United States v. Georgia*, 546 U.S. 151, 154 (2006) (finding that the ADA applies to state agencies and officials). Salinas's claims against Defendants, as state officials in their official capacities, are against the Defendants' office as employees of the TDCJ, and thus Defendants are proper parties for claims made under Title II of the ADA.

Additionally, unlike § 1983, the ADA "provide[s] for vicarious liability" so that "a plaintiff need not identify an official policy to sustain a claim against a public entity as it may be held vicariously liable for the acts of its employees under [the ADA]." *J.W. v. Paley*, 81 F.4th 440, 449 (5th Cir. 2023) (citing *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574–75 (5th Cir. 2002)).

### 1. *Title II of the ADA*

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

To allege a prima facie case under Title II, a plaintiff must bring factual allegations showing: "(1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible . . . , and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Smith v. Harris Cnty.*, 956 F.3d 311, 317 (5th Cir. 2020) (quoting *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004)).

A plaintiff may satisfy the third prong of a Title II claim by alleging a failure to accommodate. *Windham v. Harris Cnty.*, 875 F.3d 229, 236 (5th Cir. 2017). And, relevant here, Part A of Title II places an affirmative duty on public entities to reasonably accommodate the limitations that result from a person's disabilities. *Jin Choi v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 633 F. App'x 214, 215 (5th Cir. 2015). To allege a failure to accommodate claim, "a plaintiff must show that the entity knew of the disability and its consequential limitations, either because the plaintiff requested an accommodation or because the nature of the limitation was open and obvious." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723–24 (5th Cir. 2020).

Additionally, to recover compensatory damages under Title II, a plaintiff must prove that the discrimination was intentional. *Delano–Pyle*, 302 F.3d at 574. In the context of a failure-to-accommodate claim, this means the plaintiff must show the entity had "*at least* actual knowledge *that an accommodation is necessary.*" *Paley*, 81 F.4th at 450 (quoting

*Smith*, 956 F.3d at 319) (internal quotations marks omitted) (emphasis added). It is not enough that the defendants were aware of the plaintiff's disability or even the resulting impairment. *Paley*, 81 F.4th at 450 (citing *Windham*, 875 F.3d at 238). They must both know that an accommodation is necessary and deliberately refuse to provide it. And while this may look and sound like deliberate indifference, the Fifth Circuit's cases that have addressed this issue have required "something more than deliberate indifference." *Paley*, 81 F.4th at 449–50 (citing *Cadena*, 946 F.3d at 724).

The undersigned now addresses whether Salinas has plausibly alleged that the Defendants discriminated against him on the basis of his disability by refusing to provide him with his requested accommodation.[9]

### *a. A qualified individual with a disability.*

Title II of the ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

In 2008, Congress amended the ADA to expand the meaning of "disability" and broaden protections for persons with disabilities. *Willis v. Noble Env't Power, LLC*, 143 F.

---

[9] Courts have interpreted "public entity" to include prisons. *Penn. Dept. of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). Food and medical care can be benefits provided by prisons to inmates. *See Cadena*, 946 F.3d at 724–25. For the purposes of preliminary screening, the undersigned treats physical access to the various services at the Robertson Unit as benefits under Title II provided to prisoners.

Supp. 3d 475, 480–81 (N.D. Tex. 2015). "The definition of disability . . . shall be construed in favor of broad coverage." 42 U.S.C. § 12102(4)(A).

Although the ADA amendments made it easier for a plaintiff to allege a qualifying disability, the plaintiff is not absolved from the responsibility to plausibly allege a disability. *Neely v. PSEG Tex., L.P.*, 735 F.3d 242, 245 (5th Cir. 2013). And to plausibly allege a qualifying disability, a plaintiff must show an impairment that "substantially limits one or more major life activities." 42 U.S.C. § 12102(a)(1); *see also Ball v. LeBlanc*, 792 F.3d 584, 597 (5th Cir. 2015) (A qualifying disability is one that "substantially limit[s] either a major life activity or the operation of a major bodily function."). A physical impairment is "[a]ny physiological disorder or condition . . . affecting one or more body systems." 28 C.F.R. § 35.108(b)(1). This includes the musculoskeletal system. *Id*.

The authenticated records reveal that, two months after Salinas's walker was confiscated, Martin ordered x-rays of Salinas's left knee. Those x-rays revealed:

> left knee demonstrating internal fixation of the proximal tibia and distal femur with threated screws. Alignment normal. There is moderate to severe loss of medial and lateral compartment space height. Spiking of the Tibial spines is seen. Osteophytes are associated with the patella.

The radiologist's impression was that the x-rays revealed, "Postop degenerative changes left knee." Thus, even without reference to Salinas's 50% service-connected disability, it appears plausible that he suffered from a physical impairment, as defined by the ADA.

The next inquiry is whether the physical impairment "substantially limits" a major life activity. Beyond the regulation's general guidance, "substantially limits" is not defined

by Congress or the Fifth Circuit, and without a precise definition, "trial courts are left to pinpoint where the impairment falls within the substantial limitation spectrum." *Willis*, 143 F. Supp. 3d at 480–81.[10] To aid this process, courts apply factors, mirroring the regulation's guidance in 28 C.F.R. § 35.108(d)(3)(ii), to determine whether the impairment creates a substantial limitation. *Id*. (citing *Holland v. Shineski*, No. 3:10-cv-0908–B, 2012 WL 162333, at *6 (N.D. Tex. Jan. 18, 2012)). Those factors include "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long term impact, or the expected permanent or long term impact of, or resulting from, the impairment." *Holland*, 2012 WL 162333 at *6 (citing *Armstrong v. Boehringer Ingelheim, Pharm., Inc.*, No. 3:08-CV-1458–O, 2010 WL 2540751, at *15 (N.D. Tex. June 21, 2010)).

When a physical injury is a short-term, transitory condition with no permanent or long-term impacts, the injury is not a substantial limitation. *Willis*, 143 F. Supp. 3d at 484; *see also Bankhead v. Lifeguard Ambulance Serv. of Texas*, No. 4:18-CV-605-A, 2019 WL 2904364, at *3 (N.D. Tex. July 3, 2019) (finding that an injured ankle, resulting in pain and walking with a medical boot, was a temporary injury and not a disability); *see also Street v. Maverick Tube Corp.*, No. 4:15-CV-02736, 2016 WL 8711338, at *6 (S.D. Tex. June 17, 2016), *report and rec. adopted*, No. 4:15-CV-2736, 2016 WL 3948106 (S.D. Tex. July 19, 2016) ("[I]t is well-settled that a temporary injury, such as a broken foot, is not

---

[10] The *Willis* case, as well as other cases cited in this section, determine a plaintiff's disability status in the context of employment discrimination claims, which proceed under Title I of the ADA. The amended ADA, however, revised the definition of disability under each title, and so borrowing a Title I analysis of "disability" is appropriate to the undersigned's Title II analysis here.

considered a 'disability' under the ADA."). Following these trial court determinations, a non-severe condition that causes short-term pain and difficulty walking is not a substantial limitation that rises to a qualifying disability for ADA protections. *See id.*

Again, it appears at least plausible that Salinas suffered from a physical impairment that was not short term or transitory, and which prevented him from walking, at least long distances, without the assistance of a walker or cane. This conclusion is further supported, if not compelled, when the undersigned accepts Salinas's allegations as true and construes them in a light favorable to him, as the Court must. Moreover, the applicable regulations provide that mobility impairments requiring the use of a wheelchair substantially limit musculoskeletal function, and thus are a qualifying impairment to show a disability. 28 C.F.R. § 35.108(d)(2)(iii)(D). It would not be a stretch to conclude the same for a person who requires a walker or cane for ambulation.

Whether Salinas required a walker is, of course, disputed. And as explained above, it would be improper at the screening stage to resolve that factual dispute against Salinas through reliance on the authenticated records not provided by Salinas. *See Davis*, 35 F.4th at 964. But here, the authenticated records—and specifically, the October 19, 2018 x-ray results—support that it was at least plausible Salinas required some sort of mobility aid to walk.[11]

---

[11] As explained above, Salinas's deliberate indifference claims did not fail due to lack of an objective exposure to a substantial risk of serious bodily harm, but because he could not plausibly establish that prison officials subjectively "had sufficient knowledge of the situation so that the denial of medical care constituted wanton disregard of [his] rights." *Treen*, 759 F.2d at 1238.

For these reasons, the undersigned concludes that Salinas was a qualified individual with a disability.

### b. *Excluded from a service, program, or activity.*

The next inquiry under the ADA is whether Salinas was being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible. *Smith,* 956 F.3d at 317.

Salinas appears to allege that, due to his lack of a walker, he was unable to ambulate to the chow hall, the law library, and to religious services. Each of these is a service, program, or activity that TDCJ is responsible for providing to inmates. Thus, Salinas has plausibly satisfied the second element of an ADA prima facie case.

### c. *By reason of his disability.*

Lastly, the Court must consider whether Salinas's exclusion from the services, programs, or activities alleged was "by reason of his disability." *Smith*, 956 F.3d at 317. This element addresses causation and intentionality.

Salinas's ADA claim is a classic failure-to-accommodate claim. And it appears beyond dispute that he repeatedly requested a walker, citing his inability to walk long distances without one. And it would be difficult to conclude otherwise than that the Defendants knew of his *disability*. *See Cadena*, 946 F.3d at 723–24. It is less clear whether they knew of its consequential limitations and Salinas's need for an accommodation as they appear to have believed Salinas could walk without a walker.

The Court must again be careful not to resolve this dispute by use of the authenticated records. But other than conclusory labels and subjective beliefs that the defendants acted maliciously or unprofessionally, Salinas admits that he does not know why Gregory or Martin removed his walker. Dkt. No. 43 at 1–2. And the documents *Salinas filed* with his questionnaire responses—the contents of which are not disputed—appear to confirm that while Gregory and Martin were aware of Salinas's physical conditions, neither believed, based on their observations, he needed a walker as an accommodation. Here, there are no factual allegations demonstrating that any of the Defendants intentionally discriminated against Salinas *due to his disability. See Back v. Tex. Dep't of Crim. Just. Corr. Inst. Div.*, 716 F. App'x 255, 258 (5th Cir. 2017) (per curiam) (affirming dismissal of prisoner's ADA claim where he did not allege defendant intentionally discriminated against him due to his disability).

Again, while the Fifth Circuit "ha[s] not 'delineate[d] the precise contours' of [the] intentionality requirement," more is required than even deliberate indifference." *Paley*, 81 F.4th at 449–50 (citing *Cadena*, 946 F.3d at 724). And for reasons explained above in connection with Salinas's deliberate indifference claim, the undersigned is unable to reach that conclusion on these facts.

For these reasons, the undersigned RECOMMENDS that Salinas's ADA claim be dismissed for failure to state a claim upon which relief may be granted.

44

D.    <u>Claims against TDCJ</u>

Salinas brings claims against TDCJ for (1) negligence, (2) failure to protect, (3) denial of access to the courts, (4) denial of access to religious services, and (5) verbal abuse. Dkt. Nos. 22 at 3; 22-1 at 1. But Salinas pleads no facts in support of his claims against TDCJ. Moreover, Salinas's seeks only monetary damages from the TDCJ. Dkt. No. 22-1 at 1. And any monetary claim against the TDCJ is barred by Eleventh Amendment immunity. *See Cox v. Texas,* 354 F. App'x 901, 902 (5th Cir.2009) (per curiam) ("Under the Eleventh Amendment, '[a]bsent waiver, neither a State nor agencies acting under its control may be subject to suit in federal court.'" (quoting *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 144 (1993)); *see also id.* at 903 ("Neither Texas nor TDCJ has waived its immunity; therefore, Appellees' claims against them are barred by the Eleventh Amendment.").

For these reasons, the undersigned RECOMMENDS that Salinas's claims against the TDCJ be dismissed under §§ 1915(e)(2)(B) and 1915A as frivolous and for failure to state a claim upon which relief may be granted.

FURTHER LEAVE TO AMEND WOULD BE FUTILE

"Ordinarily, 'a *pro se* litigant should be offered an opportunity to amend his complaint before it is dismissed.'" *Wiggins v. La. State Univ. – Health Care Servs. Div.*, 710 F. App'x 625, 627 (5th Cir. 2017) (per curiam) (quoting *Brewster v. Dretke*, 587 F.3d 764, 767–68 (5th Cir. 2009)). But leave to amend is not required where an amendment would

be futile, *i.e.*, "an amended complaint would still 'fail to survive a Rule 12(b)(6) motion,'" *Stem v. Gomez*, 813 F.3d 205, 215–16 (5th Cir. 2016) (quoting *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014)), or where a plaintiff has already amended his claims, *see Nixon v. Abbott*, 589 F. App'x 279, 279 (5th Cir. 2015) (per curiam) ("Contrary to Nixon's argument, he was given the opportunity to amend his complaint in his responses to the magistrate judge's questionnaire, which has been recognized as an acceptable method for a *pro se* litigant to develop the factual basis for his complaint." (citation omitted)).

Here, Salinas amended his complaint twice, and supplemented his claims through his responses to two questionnaires. At this point, it is unlikely that Salinas could successfully replead his claims against the Defendants. For this reason, the undersigned finds that further leave to amend would be futile.

## CONCLUSION

For reasons explained above, the undersigned RECOMMENDS that Salinas's claims be DISMISSED under 28 U.S.C. §§ 1915(e)(2) and 1915A(b).

## TRANSFER OF CASE

Having completed the preliminary screening of Salinas's claims, the undersigned ORDERS that the transfer of this case to the United States Magistrate Judge is terminated and the case is transferred back to the docket of the United States District Judge, designed as Civil Action No. 1:20-CV-00181-H.

46

ORDERED this 2nd day of February 2024.


_____
JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE